MICHAEL ALLEN BERG ET AL. *v.* JOHN
M. MERRICKS ET AL.

[No. 567, September Term, 1973.]

*Decided April 18, 1974.*

The cause was argued before THOMPSON, DAVIDSON and LOWE, JJ.

*Edward J. Skeens* for appellants.

*Gilbert Hoffman*, with whom were *Patrick A. O'Doherty* and *Marvin B. Miller* on the brief, for appellees John M. Merricks and John V. Hrezo. *Paul M. Nussbaum* and *John Barr*, with whom were *Joseph S. Casula* and *Richard E. Ekstrand* on the brief, for other appellees.

LOWE, J., delivered the opinion of the Court.

In 1968, Michael Allen Berg (Mickey) was a nineteen year old senior at Crossland Senior High School in Prince George's County, Maryland. On October 8th of that year he fractured his neck while performing on a trampoline during

668

his regular physical education class. He has been a paraplegic since the accident.

Mickey, together with his mother, instituted suit February 19, 1971 in Prince George's County Circuit Court against his gym teacher, John M. Merricks; the principal of Crossland High, John V. Hrezo; the superintendent of schools, William S. Schmidt; the Board of Education of Prince George's County; the seven members of the Board individually; and Prince George's County for acts of negligence which he alleged caused his accident.

On August 23rd, 1971, Judge Robert B. Mathias sustained motions raising preliminary objections submitted by the County and the Board of Education, and the demurrers of the individual Board members. On April 25, 1972, Judge William B. Bowie granted Superintendent Schmidt's motion for summary judgment. The case was tried against the principal and the gym teacher. On July 13, 1973, Judge Bowie granted the motions for a directed verdict of the remaining defendants. We find that all of the results reached below were correct and affirm all judgments.

## DIRECTED VERDICTS

Appellants first direct our attention to a statement by the trial judge which suggests that he may have improperly viewed the facts when ruling on Merricks' and Hrezo's motions for a directed verdict. When a question arose as to the propriety of their submitting motions for a directed verdict for the first time at the close of the entire case, the trial judge commented:

"Well, there wasn't any motion made. They don't have to make a motion at the end of the plaintiffs' case, but they did at the end of the entire case. And if they make the motion, obviously the tactic there is — and I am sure Mr. Miller and Mr. Dougherty discussed it — you don't have the same burdens, either, at the end of the entire case."

The judge then said:

"At the end of the entire case we can consider the

> whole thing, and there is no presumption in favor
> of the plaintiffs' case in that respect."

The judge's decision on the issue before him was obviously correct, Md. Rule 522 a; however, the additional language he used to explain that decision contains an erroneous conclusion of law. A review of the record gives us no further clue as to his reason for using such unfortunate phraseology. Quite the contrary, the record indicates that he used the proper standard in granting the motions, *i.e.*, resolving all conflicts in the evidence in favor of the plaintiffs and assuming the truth of all credible evidence and of all inferences fairly deducible therefrom which tended to support the plaintiffs' right to recover. *Miller v. Michalek*, 13 Md. App. 16, 17-18. If indeed he did not view the evidence in the light most favorable to the plaintiffs as he was bound to do, we have done so and arrive at the same conclusion.[1]

Appellants argue that there was sufficient evidence of primary negligence on the part of Coach Merricks and Principal Hrezo to require the court to submit his case to the jury. We do not agree.

### Coach Merricks

Appellee Merricks has been a physical education instructor at Crossland Senior High School since 1963. He graduated from the University of Maryland where he "majored" in physical education. He had at one time participated in intramural trampoline competition and qualified as a finalist. While a student at Maryland, he gave trampoline instructions at Gallaudet College for the Deaf. He taught trampoline at Greenbelt Junior High School for three years and at two elementary schools for two years.

On October 8, 1968, Coach Merricks was teaching his twelfth grade class to perform a "back pull over"[2] on the

---

1. We, of course, must also view the evidence in the light most favorable to the plaintiffs in reviewing the propriety of the trial court's ruling. Smith v. Bernfeld, 226 Md. 400, 405.

2. Each student, in turn, was to stand at one end of the trampoline, jump up slightly and drop down to the trampoline on his seat. The trampoline would then propel his legs over his head and he would land on his stomach,

trampoline.[3] Coach Merricks had previously explained the inherent dangers of the trampoline to his class. He told them that the trampoline "was a very dangerous piece of equipment, that it could injure you or hurt you or break your neck, that you had to respect it; no horseplay."

The class of approximately thirty-eight students was divided in two groups. Each group was assigned to one of two trampolines located twenty-five feet apart. After a round of warm up exercises, Coach Merricks gave instructions for the "back pullover" and asked one of the more advanced students to demonstrate it. The students then began to take turns performing the exercise. Those waiting positioned themselves around the two trampolines as "spotters" to assist any performer who might be projected toward the frame or off the mat. Appellant's expert witness indicated that four was a safe minimum number of "spotters." Under the procedure employed by Merricks there were eighteen at each trampoline. A "spotter" is supposed to break the performer's fall and keep him on the canvas bed, thereby minimizing the possibility of injury. Coach Merricks stood midway between the two trampolines.

Mickey Berg took his place on the trampoline. John Duke, one of the students present, testified on behalf of the plaintiffs that Mickey "bounced once or twice on the trampoline and went back over without a seat drop." David Bender, another student, and also plaintiff's witness, said that Mickey's stunt appeared normal until he came down, "then he twisted his body around a little bit and landed on a slant." The third student witness, Ralph Thompson, testified that Mickey "jumped back a little, without doing a seat drop

hands and knees or feet. The students had previously been taught bouncing to gain balance and momentum, a "seat drop" and a "back roll." The "back pullover" combined the "seat drop" and the "back roll" in one continuous movement. It was established at trial that the exercise was less advanced than a "back pullover" executed in the middle of the trampoline.

3. A trampoline is a piece of athletic equipment consisting of a large piece of canvas, approximately six by twelve feet, stretched tightly and held to a nine by fifteen foot frame by numerous springs or elastic bands. The canvas bed and stationary frame are usually several feet above the floor. The propulsion required to perform skills on the apparatus is attained by bouncing on the canvas bed.

and came down on his shoulders." Coach Merricks testified that he did not see Mickey's attempt. Mickey related, "I got in the take off position and I believe I started up on my toes and the fall back, and from there I do not remember." [4]

Appellants submit that Coach Merricks failed to exercise due care for Mickey's safety in 1) failing to watch him as he performed 2) requiring the class to hurry 3) neglecting to stand on the frame of the trampoline level with the performer ready to break his fall by hand 4) instructing the students that they were to land on their stomachs 5) ignoring the confusion among the students 6) failing to take account of the individual abilities of his students 7) teaching trampoline without adequate background or expertise. Each of these assignments of error is an after the fact substitution of judgment for the instructional methods used. Appellants bear the burden of proving that one or more violated a standard recognized in the teaching of high school gymnastics or a procedure mandated by proper authority.

The substance of appellants' initial question has been decided by the Court of Appeals. Beyond that, even the record fails to support their assertion. Appellants' expert, Norman R. Holzaepfel, the varsity gymnastic coach at the University of Iowa, testified that an instructor of a class of forty twelfth grade boys using two trampolines should stand at some distance from the trampolines so that he could observe both groups at the same time. Neither this nor anything else in the record indicates that Mickey Berg's tragic accident could have been avoided even if Coach Merricks had kept his eyes riveted on him.

The Court of Appeals in *Segerman v. Jones*, 256 Md. 109, ruled that a teacher who *left the classroom* while young children were doing push-ups and other fitness exercises was not liable for an injury sustained by one of the children during her absence. The Court said that it had not been shown that her presence could have prevented the accident.

---

4. All the testimony in the case was presented by appellants. Appellees Merricks and Hrezo were called under the adverse party rule, Md. Code, Art. 35, § 9, the substance of which now appears in Courts and Judicial Proceedings Art., § 9-113.

The injury could just as well have occurred while she was in the classroom. The Court found that the proximate cause of the injury was the intervening and fully unforeseeable action of another pupil who left his place and did not do the exercise as instructed.

The evidence in this case indicates that Mickey Berg's injury was caused by his failure to follow Coach Merricks' instructions. There was uncontradicted evidence that Mickey did not do a "seat drop" at the start of the exercise but instead jumped back (apparently attempting an aerial back flip) landing on his shoulders. Berg's precipitous action was wholly unforeseeable.

The remaining acts or omissions by Coach Merricks, which appellants contend caused Mickey's fall, fail to establish primary negligence for the same reason.

There was evidence that Mickey began his exercise just a few minutes before the end of the class period and that the coach had told the students to hurry along so they could take showers. There was no testimony, however, by Mickey Berg, or any other witness, that he felt rushed, or was anxious or concerned by the time.

Appellants claimed that Coach Merricks should have used the trampoline frame, a desk pushed under the trampoline, or a new, recently advertised instructional pad as a platform so that he could have been nearer the students as they performed. Coach Holzaepfel did not aver that these devices were generally used, that they were required for proper instruction or that they should be used in teaching a "back pullover." Coach Merricks testified that the student spotters surrounding the trampoline provided adequate protection for anyone doing the exercise. He felt it necessary for an instructor to get on a trampoline only when students were doing flips or somersaults. Again, there was no evidence that the presence of Coach Merricks on the frame, a desk or a special platform (had one been available) could have prevented Mickey's injury.

Appellants maintain that it was improper to instruct students to land on their stomachs at the completion of the "back pullover." Although the testimony differed as to a

preferred landing position, there was no evidence that the instruction caused the accident. Mickey was injured not because he concluded the exercise improperly, but because he began it improperly. We cannot speculate that telling Mickey to land on his stomach caused him to land on his neck, or that telling him to land on his hands and knees could have avoided the injury. The record gives us no guidance.

Appellants contend that Coach Merricks' instructions confused his students. Although one student did testify that he was slightly perplexed by the Coach's instructions, Mickey's own testimony indicated he understood what was expected of him. If any confusion existed, it is relevant only if related to Mickey's state of mind. In the absence of any indication of confusion by him, we find this allegation without relevance.

Appellants also maintain that the Coach should have kept a log indicating each pupil's experience and daily progress on the trampoline. They failed to establish, however, that such a procedure was generally followed or that it could have averted this accident. Without regard to the merits of appellants' personal opinion of proper physical education procedure, they must provide some evidentiary standard beyond their personal preferences.

Finally, appellants charge that Coach Merricks was unqualified to teach trampoline to high school students. Coach Merricks' qualifications are set forth above. Again, appellants failed to show that any more extensive training or expertise was, is or should be required. Without more, we cannot say that Coach Merricks' education or expertise was deficient.

Even in such a tragic situation, the burden is on the appellants to point to an act or omission which a jury could reasonably infer caused the injury, and to show that such an act or omission did not conform to a standard of reasonable conduct. There are very few persons who do not have strong opinions or criticisms of educational procedures, policies and practices. The jury cannot be permitted to speculate on whether appellants' theories were desirable or indeed to

substitute their own. They must be provided a standard with which to evaluate the procedures used by professionals; appellants may then point to that which they feel violated that standard. No instructional standard was established. The judge was clearly correct in refusing to permit the jury to speculate on the "might have been theories propounded by appellants."

> " . . . [I]n any action for damages the court is not justified in inferring negligence merely from possibilities. A mere surmise that there may have been negligence on the part of the defendant will not justify the court in submitting the case to the jury. The plaintiff must produce some evidence that the defendant, either by his act or omission, violated some duty incumbent upon him that caused the injury. If there is no evidence upon which a rational conclusion may be based in support of the plaintiff's claim, the court should withdraw the case from the jury. *Baltimore & Ohio R. Co. v. State, to Use of Savington,* 71 Md. 590, 599, 18 A. 969; *Riley v. New York, Philadelphia & Norfolk R. Co.,* 90 Md. 53, 58, 44 A. 994; *Sullivan v. Smith,* 123 Md. 546, 558, 559, 91 A. 456." *Brehm v. Lorenz,* 206 Md. 500, 506.

When viewing the evidence in the light most favorable to appellants we cannot totally disregard the testimony elicited by the appellants but adverse to their position. Of the three students present the day of the accident, two, Duke and Thompson, testified that Mickey did not do a seat drop as instructed but just jumped back and came down on his shoulders without first gaining momentum by dropping to the mat. The third student, Bender, testified that Mickey's stunt appeared normal until he landed. Bender admitted, however, that his memory of the events was quite vague. He did not testify that appellant did the required seat drop. Even if Mickey's precipitous backward movement was not the sole cause of his injury, it surely was a contributing factor. It was, however, the *only* evidence of how the injury occurred and was an act which a reasonable, careful and

prudent gym teacher could not have anticipated under the circumstances. To say that Coach Merricks should have anticipated that a student who knew he was supposed to drop to his seat on the mat would flip to his shoulders would be to permit sheer conjecture. "Such gossamer speculation is the stuff from which dreams are made and not the foundation stone for an action in negligence." *Segerman v. Jones, supra,* 134.

Appellants quote a statement from *Segerman, supra,* which they hold to be the "general community attitude:"

> "Parents do not send their children to school to be returned to them maimed because of the absence of proper supervision."

Such a statement in the face of the tragedy here is indeed compelling; however, teachers who conform to every educational standard known to them should also know that they are protected by legal standards from the fraility of human judgment oft affected by emotion and compassion. These standards of prudent conduct are sometimes found in statutes, sometimes in precedent but more often, as here, they must be proved as facts of professional life. No more than doctors or lawyers, should teachers be forced to perform their responsibilities with trepidation, in fear of being held accountable without knowing the standards which they are called upon to meet. There must be some showing that the defendant proximately caused the accident by his breach of a defined duty owed appellant.

The nature of physical education activities comprehends physical hazards. The instructor must avoid as many of these hazards as he is humanly able considering the limitations under which he instructs, but the system cannot be made childproof. That such danger could reasonably have been anticipated and avoided in this setting is the standard appellants have failed to provide.

As delicate a balance exists in attempting to develop a child's body as in attempting to develop his mind. How to maintain that balance is largely a matter of judgment. To the extent that each child is given personal attention,

thirty-nine others may be deprived. Which need is given preference upon a given time is a decision made hundreds of times a day by a teacher. The problems are multiplied as a teacher comes to know his students and their various needs and differences. All of these decisions occur repeatedly every fifty minutes daily with classes of various sizes.

In making sensitive "judgment calls" a teacher must not be made aware of the precariousness of his position, as was Damocles, beneath some economic falchion suspended by the hair of hindsight. The courts are just as much a shield to a teacher who has acted prudently as they are a weapon against him if he has neglected his duty; but a jury cannot measure his actions without some measure of professional conduct.

### *Principal Hrezo*

Regarding the appellee Hrezo, the principal, we find even less than a scintilla of evidence of negligence or responsibility. In the words of Judge McWilliams, " . . . if we assume it takes ten gossamers to make a scintilla then the [appellant's evidence] . . . falls well short of five gossamers." *Turner v. Hammond*, 270 Md. 41, 60.

Appellants called Hrezo as their own witness. He testified that the physical education department was responsible to a county supervisor of physical education and not to the principal. He stated that no one in the school could require a student to take a physical examination except for extracurricular purposes and that the school was forced to rely upon health information supplied by parents. He pointed out that neither he nor Coach Merricks controlled the number of students in classes and that Merricks was doing an excellent job and was the best qualified of his teachers to teach trampoline. In response to questions relating to a curriculum guide he testified that Coach Merricks was not obliged to follow that guide but that it was merely a reference for instructors. Principal Hrezo further testified regarding the care that he took in instructing all teachers as to matters of safety. We find nothing remotely connecting the principal with the accident.

"While proximate cause is ordinarily a question of fact, it becomes a question of law in cases where reasoning minds cannot differ, or where uncontroverted evidence establishes an efficient intervening cause." *Segerman v. Jones, supra,* 135.

## SUMMARY JUDGMENT

### *Superintendent Schmidt*

The fifth count of appellants' amended declaration was directed against William S. Schmidt, Superintendent of Schools of Prince George's County. Appellants appeal the granting of appellee Schmidt's motion for summary judgment.

Count Five incorporated by reference the allegations in Counts One and Three against Merricks and Hrezo. Since the superintendent had recommended that the Board approve a curriculum guide sanctioning trampoline instruction in County high schools appellants suggest that he was negligent in:

1) not requiring Merricks to take professional trampoline training;
2) failing to provide the recently marketed spotting equipment at Crossland High School;
3) recommending advanced trampoline maneuvers without assuring that all students taking trampoline class were in top physical condition and segregated according to ability.

Appellee Schmidt's affidavit in support of his motion for summary judgment stated in part that:

1) as Superintendent he was the secretary-treasurer and executive officer of the county Board of Education;
2) he was responsible for the administration of educational policies adopted by the State and County Boards of Education;
3) any recommendations regarding specialized

curricula were made in reliance upon the advice of experts employed by the local board and certified by the State Board of Education;

4) the County Board approved the use of trampoline equipment in 1952/53;

5) he had the duty of recommending for appointment by the County board professional personnel employed in the public schools.

The summary judgment requirements set forth in Md. Rule 610 were reviewed in *Lipscomb v. Hess*, 255 Md. 109, 118, and were repeated in *Shaffer v. Lohr*, 264 Md. 397, 403-404:

" 'The limitations on summary judgment procedure are too well known to require elaboration. It is not a substitute for trial but a hearing to determine whether a trial is necessary, *Whitcomb v. Horman*, 244 Md. 431, 224 A. 2d 120 (1966); *Strickler Engineering Corp. v. Seminar, Inc.*, 210 Md. 93, 122 A. 2d 563 (1956), when there is no genuine controversy, *Pullman Co. v. Ray*, 201 Md. 268, 94 A. 2d 266 (1953). The purpose of the hearing is not to determine disputed facts, but to determine whether such issues exist. *Horst v. Kraft*, 247 Md. 455, 231 A. 2d 674 (1967); *Carroccio v. Thorpe*, 222 Md. 38, 158 A. 2d 660 (1960); *Tellez v. Canton R.R. Co.*, 212 Md. 423, 129 A. 2d 809 (1957); *White v. Friel*, 210 Md. 274, 123 A. 2d 303 (1956). If facts are susceptible of more than one inference, the inferences must be drawn in the light most favorable to the person against whom the motion is made, *Lawless v. Merrick*, 227 Md. 65, 175 A. 2d 27 (1961), and in the light least favorable to the movant, *Howard Cleaners of Baltimore, Inc. v. Perman*, 227 Md. 291, 176 A. 2d 235 (1961); *Roland v. Lloyd E. Mitchell, Inc.*, 221 Md. 11, 155 A. 2d 691 (1959). 255 Md. at 118.' "

We agree with the court below that the allegations of appellants' affidavit regarding the superintendent's

responsibilities are either not sufficiently specific or simply erroneous, and they show no genuine dispute of any material issue laying negligence at the door of Superintendent Schmidt. Nevertheless we cannot agree that the superintendent is protected by the cloak of immunity, had his conduct been negligent and a factor causing the injury.

"In Maryland, governmental immunity is extended to all non-malicious acts of *public officials* as opposed to *public employees* when acting in a discretionary as opposed to ministerial capacity. *Clark v. Ferling*, 220 Md. 109, 151 A. 2d 137 (1959); *Cocking v. Wade*, 87 Md. 529, 40 Atl. 104 (1898)." *Duncan v. Koustenis*, 260 Md. 98, 104. However, the very section of the Code assigning the superintendent his ex-officio capacities with the board divests him of the protection accorded a "public officer."

> "The county superintendent of schools shall be **executive officer, the secretary, and treasurer of** the county board of education, *but shall not be deemed a public officer under the constitution or laws of this State . . . .*" (Emphasis added.) Md. Code, Art. 77, § 39.

It further provides that although he shall attend the meetings of the board, he shall have *no* vote. The statute clearly deprives the superintendent of the limited protection of governmental immunity enjoyed by public officers. In addition, *Lyman v. Baltimore City*, 92 Md. 591, 612, held that the Superintendent of Public Instruction of Baltimore City was not a municipal official but an employee because, among other reasons, "he exercises no power except what is derived in and through his board."

Notwithstanding the unavailability to the superintendent of the cloak of immunity, we find that appellants' allegations against him fail as a matter of law to raise a genuine dispute as to whether he was negligent in the performance of his duties. "In order to prevent the granting of a motion for summary judgment the objecting party must show more than that there was a question of fact presented, he must, of course, also show that the resolution of that

question will somehow affect the outcome of the case, *i.e.*, that it is a material fact." *Parklawn v. Nee,* 243 Md. 249, 254; see also *Meola v. Bethlehem Steel,* 246 Md. 226, 239-240. The only questions of fact that could affect the outcome of the case were basically policy decisions outside the aegis of the statutorily defined limits of the superintendent's authority. The issues material to the question of negligence were exclusively within the scope of responsibility of the Board of Education of Prince George's County.

Nor is it the function of the *county* superintendent to establish the qualifications of the professional personnel in the county schools. That responsibility rests with the *State* Superintendent of Education acting in compliance with the rules and regulations of the State Board of Education. Md. Code, Art. 77, § 27. Finally, as appellee Schmidt notes in his affidavit, the final decisions regarding the purchase of equipment and the curriculum are made by the county board, not the superintendent. The superintendent cannot be held accountable for decisions of the Board of Education which he cannot so much as vote upon, much less control.

## GOVERNMENTAL IMMUNITY

### *The County*

The injury prompting this action occurred on October 8, 1968. A new charter for Prince George's County waiving governmental immunity from tort actions was adopted on November 3, 1970. It became effective February 8, 1971. Appellants filed suit February 19, 1971. They now argue that "where the defense of governmental immunity has been abolished by a charter provision, such prohibition applies to all actions whether accrued, pending or future since no contrary intention is expressed in the charter and no vested rights or existing remedies of the county are destroyed." Appellants are in error. We have decided the precise question in *Ramsey v. Prince George's Co.,* 18 Md. App. 385, 391, *et seq.* In *Ramsey,* we held that the Prince George's County Charter became effective February 8, 1971 and that its waiver of governmental immunity was inapplicable to a

tort action brought by the heirs of a person shot by a police officer on November 30, 1970. In the absence of express indication of retroactive application, we find that appellants are foreclosed by the governmental immunity then shielding the County.

### The County Board of Education

Appellants' innovativeness is attested by their next assignment of error. The court below sustained the motion raising preliminary objections of the Prince George's County Board of Education, without leave to amend, and sustained the demurrers of the individual board members on August 23, 1971. These motions had been filed April 26, 1971 testing the declaration filed February 8, 1971. Appellants argue that Md. Code, Art. 77, § 56B constituted waiver of governmental immunity from tort claims up to one hundred thousand dollars. We see no need to interpret the intent of this legislation. Whatever its purpose appellants cannot avail themselves of it. The effective date of the Act codified in that section was July 1, 1971. Laws of Maryland, 1971, Ch. 548.

"It is a cardinal canon of statutory construction that 'retrospective operation of a statute is not favored.' *Rigger v. Baltimore County, Maryland,* et al., 269 Md. 306, 305 A. 2d 128 (1973); *State Farm v. Hearn, Adm'x,* 242 Md. 575, 219 A. 2d 820 (1966); *Bell v. State,* 236 Md. 356, 204 A. 2d 54 (1964); *Gutman v. Safe Deposit & Trust Co.,* 198 Md. 39, 81 A. 2d 207 (1951); 2 Sutherland, *Statutory Construction,* § 2201 (3rd ed. 1943). There is a general presumption that statutes are intended to operate prospectively and the presumption may be rebutted only by a clear expression in the statute of a contrary legislative intention. *Zebron v. American Oil Co.,* 10 Md. App. 308, 310, 270 A. 2d 339 (1970); and *see Unsatisfied Claim and Judgment Fund Board v. Bowman,* 249 Md. 705, 708, 241 A. 2d 714 (1968)." *Ramsey v. Prince George's Co., supra,* 392.

Since appellants' resort to the newly enacted partial waiver in Art. 77, § 56B is an admission that the Board and its members are immune, little need be said to reinforce the applicability of the doctrine of governmental immunity to all non-malicious acts of public officials when acting in a discretionary capacity. Cf. *Clark v. Ferling*, 220 Md. 109. The members of the Board of Education meet all of the tests of public officials as set forth in *Gary v. Board of Trustees*, 223 Md. 446, 449. Cf. *Duncan v. Koustenis, supra,* 102; *Weddle v. School Commissioners*, 94 Md. 334, 344.

*Judgments affirmed.*
*Costs to be paid by appellants.*